STATE OF NORTH CAROLINA v. STEVEN MARK BISHOP a/k/a KEITH DARREN WILLIAMS

No. 207A94

(Filed 31 July 1996)

**1. Jury § 154 (NCI4th)— capital murder—jury selection— attitudes toward death penalty**

The trial court did not abuse its discretion during jury selection in a first-degree murder prosecution by sustaining the State's objection to the defendant's question, "Would you find it difficult to consider voting for life imprisonment for a person convicted of first-degree murder?" where the court sustained the objection because it disagreed with the wording of the question but permitted defendant to ask other questions that gave defendant a fair opportunity to make the inquiries allowed under *Morgan v. Illinois*, 504 U.S. 719.

**Am Jur 2d, Jury § 279; Criminal Law § 685.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**2. Jury § 102 (NCI4th)— capital murder—jury selection— questions regarding pretrial publicity**

The trial court did not improperly limit *voir dire* of prospective jurors during jury selection for a first-degree murder prosecution where defendant contended that the court did not allow defendant to question prospective jurors concerning the content of pretrial publicity to which they had been exposed, but defendant cites no instance where a question he asked was not allowed and defendant did not show that he was forced to accept any juror who expressed or formed an opinion based on pretrial publicity.

**Am Jur 2d, Jury § 294; Criminal Law § 688.**

**3. Jury § 132 (NCI4th)— capital murder—jury selection— questions concerning law enforcement officer known to juror**

There was no abuse of discretion during jury selection for a first-degree murder prosecution where defendant was not allowed to ask which division or department employed a law

enforcement officer whom a prospective juror knew but the court allowed defendant to ask whether any juror had a bias in favor of law enforcement, knew anyone who was a law enforcement officer, and knew any law enforcement officer on the witness list. Nothing in this juror's responses indicated that she was partial or biased.

**Am Jur 2d, Jury §§ 303, 304.**

### 4. Jury § 132 (NCI4th)— capital murder—jury selection— juror with murdered friend—ability to be fair

There was no prejudice during jury selection for a first-degree murder prosecution where a prospective juror indicated that she had had a friend who had been a homicide victim but stated that she would try to do her best to base her verdict only on the evidence and instructions in the present case and the court sustained an objection to the question "Are there any factors that you think may interfere with that ability?" The juror subsequently responded "Yes" when asked whether she could look defendant in the eye and assure him she would be fair. Assuming that sustaining the objection was error, the juror's ability as a fair juror was adequately expressed.

**Am Jur 2d, Jury §§ 303, 304.**

**Fact that juror in criminal case, or juror's relative or friend, has previously been victim of criminal incident as ground of disqualification. 65 ALR4th 743.**

### 5. Jury § 127 (NCI4th)— capital murder—jury selection— membership in clubs or organizations

The trial court did not abuse its discretion during jury selection in a first-degree murder prosecution by not allowing defendant to ask if any juror was a member of any type of club, social club, or community civic or political organization. The court declined to allow a question that was not closely tied to the prospective jurors' fitness and competency to serve as jurors or to their ability to render a fair and impartial verdict, but did allow similar questions that were more closely tied and that provided adequate inquiry into the jurors' fitness and competency.

**Am Jur 2d, Jury § 311.**

### 6. Jury § 119 (NCI4th)— capital murder—jury selection— questions to alternate juror limited—no prejudice

There was no prejudice in juror selection for a first-degree murder prosecution where defendant claimed the court limited the scope of his *voir dire* of a prospective juror, but that juror was an alternate throughout the case and did not deliberate or return a verdict against defendant.

**Am Jur 2d, Jury § 126.**

### 7. Jury § 141 (NCI4th)— capital murder—jury selection— possibility of parole

The trial court did not err during jury selection in a first-degree murder prosecution by not instructing the jury venire on the meaning of a life sentence where defendant did not ask the trial court to instruct the prospective juror or the jury panel on the meaning of life imprisonment. The trial court's direction of the *voir dire* of the prospective juror adequately communicated to her and the jury panel that jurors were not to consider parole in their deliberations. Furthermore, defendant did not persuade the Supreme Court that the trial court's failure to give further instruction caused the jury to consider the possibility of parole.

**Am Jur 2d, Jury §§ 205, 206.**

### 8. Evidence and Witnesses § 2047 (NCI4th)— capital murder—defendant's relationship with accomplice—lay opinions

The trial court did not err in a first-degree murder prosecution by admitting lay testimony that defendant and his younger brother, who testified for the State as an alleged accomplice, had a codependent relationship that was like a father/son relationship and that defendant dominated his brother. The testimony met the requirements of N.C.G.S. § 8C-1, Rule 701 for opinion testimony by lay witnesses in that it was rationally based on the perception of the witnesses, who worked with the two men, and was helpful to a clear understanding of a fact in issue, whether the brother acted at the direction of defendant and was acting in concert.

**Am Jur 2d, Expert and Opinion Evidence §§ 26-31, 53, 54.**

9. **Criminal Law § 398 . (NCI4th)— capital murder—jury— judge's comment concerning employers—not expression of. opinion**

The trial court did not express an opinion with respect to defendant's guilt in a first-degree murder prosecution where a juror approached the judge concerned about his employment and the judge made a statement which, read in context, commented on the attitude he perceived employers to have and expressed no opinion on any question of fact to be decided by the jury. Immediately before that conversation, the judge had instructed the jury that he may have "fussed" at one of the lawyers from impatience, not because he had an opinion and that they should not infer it to mean that he had an opinion, and also instructed the jurors during the guilt-innocence phase charge that he had no opinion.

**Am Jur 2d, Trial §§ 272, 276, 307.**

10. **Constitutional Law § 309 (NCI4th)— financial card fraud— closing argument—not a concession of guilt**

Defendant's counsel did not concede defendant's guilt of financial transaction card fraud during his closing argument in a prosecution arising from a breaking and entering, robbery, kidnapping, and murder where defense counsel stated in his argument that the State had put on evidence that an accomplice gave money to defendant when he used the card, that the jury would apply that evidence to the crime of financial transaction card fraud, that it would be for the jury to find that defendant was guilty of financial transaction card fraud if they believed the evidence beyond a reasonable doubt, and that, even if defendant had received and spent the money, that did not show that defendant committed the other crimes charged against defendant.

**Am Jur 2d, Trial §§ 533 et seq.**

11. **Criminal Law § 464 (NCI4th)— capital murder—prosecutor's closing argument—supported by other than corroborative evidence**

The trial court did not err by not intervening *ex mero motu* in the prosecutor's closing argument in a first-degree murder prosecution where the prosecutor argued that defendant pulled the trigger rather than his brother and accomplice. Defendant argued that this argument used evidence admitted for corroborative or

impeachment purposes as substantive evidence, specifically the brother's first statement to officers. However, any argument that defendant pulled the trigger was supported by evidence other than the brother's first statement to police.

**Am Jur 2d, Trial §§ 533 et seq.**

12. **Criminal Law § 443 (NCI4th)— capital murder—prosecutor's argument—victim's personal representative**

The trial court did not err by not intervening *ex mero motu* in the prosecutor's closing argument in a first-degree murder prosecution where defendant claimed that the prosecutor improperly described his role as the victim's personal representative. Counsel may defend their own tactics when challenged and the prosecutor's argument was a response to allegations by defendant's counsel.

**Am Jur 2d, Trial §§ 533 et seq.**

13. **Criminal Law § 468 (NCI4th)— capital murder—prosecutor's argument—victim died without trial—no gross error**

The trial court did not err by not intervening *ex mero motu* in the prosecutor's closing argument in a first-degree murder prosecution where defendant claimed that the prosecutor implicitly criticized his decision to exercise his right to fair trial by an impartial jury when he argued that the victim died without a trial. A similar argument was held not grossly improper in *State v. Basden*, 339 N.C. 288.

**Am Jur 2d, Trial §§ 533 et seq.**

14. **Criminal Law § 793 (NCI4th)— acting in concert—instructions—intent**

The trial court did not err in its instructions on acting in concert by failing to require the jury to find that defendant had the intent necessary to support a finding of guilty of felonious breaking and entering, conspiracy, first-degree murder, and financial transaction card fraud. The challenged instruction on acting in concert is substantially similar to the pattern jury instruction and to the jury instruction upheld in *State v. McCarver*, 341 N.C. 364. Moreover, the court's instructions on the individual crimes clearly required the jury to find that defendant had the specific intent to commit the crimes in order to find him guilty.

**Am Jur 2d, Trial §§ 1251, 1253.**

**15. Criminal Law § 1337 (NCI4th)— capital murder—sentencing—aggravating circumstance—prior felony involving violence—timing of conviction**

The trial court did not err in a capital sentencing proceeding by submitting the aggravating circumstance of a prior felony involving the use or threat of violence where defendant had committed an assault with a deadly weapon with intent to kill inflicting serious injury on 4 July 1991, this murder occurred on 7 October 1991, defendant was convicted of the felony assault on 31 March 1992, and judgment was entered in this case on 27 April 1994. Although defendant argues that he had not been convicted of the prior felony at the time this murder occurred, the evidence shows that the conduct upon which the assault conviction was based occurred prior to the date of the events out of which the capital felony charge arose. *State v. Silhan,* 302 N.C. 223, is directly on point. N.C.G.S. § 15A-2000(e)(3).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.**

**16. Criminal Law § 1339 (NCI4th)— capital sentencing—aggravating circumstances—murder committed in the commission of kidnapping and for pecuniary gain—not redundant**

The trial court did not err in a capital sentencing proceeding by permitting the jury to consider as statutory aggravating circumstances that the murder was committed while the defendant was engaged in the commission of kidnapping, N.C.G.S. § 15A-2000(e)(5), and that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6). Although defendant argued that these circumstances were redundant because the felony underlying the (e)(5) circumstance was motivated by a desire to obtain something of monetary value, the evidence underlying the circumstances was not the same. The trial court should have instructed the jury that it could not use the same evidence as the basis for finding both circumstances, but there was no prejudice because there was sufficient independent evidence to warrant a finding of each aggravating circumstance.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting, or fleeing from other offense, and the like—post-*Gregg* cases. 67 ALR4th 887.

**17. Criminal Law § 1363 (NCI4th)— capital sentencing—nonstatutory mitigating circumstances—codefendant avoiding death penalty with plea bargain**

The trial court did not err in a capital sentencing proceeding by not submitting to the jury the nonstatutory mitigating circumstance that a codefendant or accomplice will avoid the death penalty based upon a plea agreement. Evidence of a codefendant's sentence for the same offense is not relevant to the jury's sentencing determination.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**18. Criminal Law § 1363 (NCI4th)— capital sentencing—nonstatutory mitigating circumstance—abuse of sister**

The trial court did not err in a capital sentencing proceeding by not submitting to the jury the nonstatutory mitigating circumstance that defendant's father sexually abused his older sister. Defendant failed to show that the evidence supported the requested circumstance as written, defendant does not argue that the evidence supports the assertion that defendant's father sexually abused defendant and his older brother, and, while defendant argues that the abuse of his sister led to his parents' divorce, which led to defendant's personal feelings of guilt for his father leaving him, the court submitted the nonstatutory mitigating circumstance that defendant's father was significantly absent from his life, which subsumed any indirect mitigating value that his father's abuse of his sister may have had. Finally, the catchall mitigating circumstance was submitted and the jury was not precluded from considering any mitigating evidence.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**19. Criminal Law § 1363 (NCI4th)— capital sentencing—nonstatutory mitigating circumstance—poor impulse control**

The trial court did not err in a capital sentencing proceeding by not submitting the nonstatutory mitigating circumstance that

defendant has significantly poorer impulse control than others due to his mental and emotional disturbances where the court submitted the statutory circumstances that the murder was committed while defendant was under the influence of a mental or emotional disturbance and that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. N.C.G.S. § 15A-2000(f)(2); N.C.G.S. § 15A-2000(f)(6).

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**20. Criminal Law § 1363 (NCI4th)— capital sentencing—nonstatutory mitigating circumstance—family cares for him**

There was no prejudicial error in a capital sentencing hearing where the trial court failed to submit the requested nonstatutory mitigating circumstance that defendant's family loves and cares about defendant. The evidence to support this circumstance relates only to defendant's family relationships in his childhood, not at the time of the crime or of trial; however, any error was harmless because the court instructed on the catchall circumstance, which no juror found to exist. The court's ruling did not prevent defendant from presenting, or the jury considering, any such evidence.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**21. Criminal Law § 1363 (NCI4th)— capital sentencing—nonstatutory mitigating circumstance—defendant not wanting to die**

The trial court did not err in a capital sentencing proceeding by failing to submit the nonstatutory mitigating circumstance that defendant does not want to die. No evidence was entered in either phase of the trial in support of this requested circumstance.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**22. Criminal Law § 1316 (NCI4th)— capital sentencing—prior sentencing as habitual felon**

The trial court did not err in a capital sentencing hearing by allowing the State to inform the jury that defendant had already been sentenced to life imprisonment as an habitual felon. In support of the aggravating circumstance that defendant had been previously convicted of a felony involving the use or threat of vio-

lence, the prosecutor introduced into evidence a certified copy of a judgment and commitment form showing that defendant had been found guilty of "Assault with a deadly weapon with intent to kill inflicting serious injury while being a Habitual Felon." The habitual felon language was part of the full name of the offense for which defendant had been convicted. Moreover, defendant was free to offer evidence of the felonies he had committed and was not required to leave the jury free to speculate that defendant's habitual felon status rested upon other convictions for violent felonies. N.C.G.S. § 15A-2000(e)(3).

**Am Jur 2d, Criminal Law § 599.**

**Court's right, in imposing sentence, to hear evidence of, or to consider, other offenses committed by defendant. 96 ALR2d 768.**

**23. Criminal Law § 1348 (NCI4th)— capital sentencing—definition of mitigating circumstance**

The trial court did not err during a capital sentencing proceeding by not intervening when the prosecutor defined mitigating circumstance. The prosecutor's definition was a correct statement of the law and, although evidence of defendant's age, character, education, environment, habits, mentality, and prior record may be relevant considerations in a sentencing hearing, these words are not essential to the basic definition of a mitigating circumstance.

**Am jur 2d, Criminal Law §§ 598, 599.**

**24. Criminal Law § 454 (NCI4th)— capital sentencing—prosecutor's argument—mitigating circumstances weighed against a human life**

A prosecutor's argument in a capital sentencing proceeding was not grossly improper and the court did not err by not intervening *ex mero motu* where the prosecutor argued that the mitigating circumstances should be weighed against "a human life, and the way in which [the victim] died, and the reasons why she died." Although defendant argues that the capital sentencing scheme requires the jury to balance the mitigating evidence against the aggravating evidence rather than to balance the mitigating evidence against the victim's life, the prosecutor simply

encouraged the jury to focus on the facts he believed justified the imposition of the death penalty and did not urge the jury to disregard the law.

**Am Jur. 2d, Criminal Law §§ 598, 599; Trial § 1760.**

### 25. Criminal Law §442 (NCI4th)— capital sentencing—prosecutor's argument—sympathy

A prosecutor's argument in a capital sentencing proceeding was not so grossly improper that the court erred by not intervening *ex mero motu* where defendant contended that the prosecutor improperly advised jurors not to let feelings of mercy or sympathy overwhelm their objectivity, but the meaning was not necessarily to ask the jurors to disregard feelings of mercy or sympathy altogether, but to do so only where they were divorced from the evidence, thereby overwhelming the jurors' objectivity.

**Am Jur 2d, Trial §§ 648, 649, 1457.**

### 26. Criminal Law § 447 (NCI4th)— capital sentencing—prosecutor's argument—sympathy for victim

There was no error in a capital sentencing proceeding where defendant contended that the prosecutor improperly urged the jury to impose the death penalty as a result of the victim's good qualities by attempting to play upon sympathy for the victim and by referring to what she could have accomplished had she lived. The United States Supreme Court has upheld the use of victim impact statements, stating that victim impact evidence is simply another method of informing the sentencing authority about the specific harm, and in this case the prosecutor's arguments about the victim and what she could have accomplished served to inform the jury about the specific harm caused by the crime.

**Am Jur 2d, Trial §§ 648, 649, 664-667, 1457.**

### 27. Criminal Law § 436 (NCI4th)— capital sentencing—prosecutor's argument—defendant pulling trigger rather than accomplice

There was no error in a capital sentencing proceeding where defendant contended that the prosecutor's argument that defendant pulled the trigger rather than an accomplice was based on impeachment evidence, but the argument was in direct response to defendant's argument that the prosecutor had given the actual

murderer a life sentence and the argument was adequately supported by other evidence.

**Am Jur 2d, Trial §§ 533 et seq.**

**28. Criminal Law § 455 (NCI4th)— capital sentencing—prosecutor's argument—deterrence**

There was no prejudicial error in a capital sentencing proceeding where defendant contended that the prosecutor improperly argued that defendant should be sentenced to death to deter others by reading from reported cases. The prosecutor's arguments, in context, focused on the appropriateness of capital punishment for "exceptionally vicious crimes" and "particularly offensive conduct," and could not be construed as urging the death penalty to deter others. However, assuming that these arguments could have been interpreted as indirect general deterrence arguments, defendant was allowed rebuttal with a lengthy direct argument on the subject.

**Am Jur 2d, Trial § 572.**

**29. Criminal Law § 1341 (NCI4th)— capital sentencing—aggravating circumstance—pecuniary gain**

There was no plain error in a capital sentencing proceeding in the court's instructions concerning the N.C.G.S. § 15A-2000(e)(6) aggravating circumstance of pecuniary gain where the instruction was substantially similar to the pattern jury instructions and the jury indicated that the motivation and purpose of the murder was pecuniary gain by answering "Yes" to the question "Was this murder committed for pecuniary gain?" on the issues and recommendation form.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.**

**30. Criminal Law § 682 (NCI4th)— capital sentencing—mental or emotional disturbance and impaired capacity—no peremptory instruction**

The trial court did not err in a capital sentencing proceeding by failing to peremptorily instruct on the statutory mitigating cir-

cumstances of mental or emotional disturbance and impaired capacity and the nonstatutory circumstances that defendant was less able than others to visualize or anticipate social consequences due to his disturbances and that his turbulent family history significantly affected his mental and emotional development where the testimony of the clinical social worker on which defendant relied was developed for trial rather than to treat defendant. It lacks the indicia of reliability based on the self-interest inherent in obtaining appropriate medical treatment and is not manifestly credible. Moreover, even if it supported finding that the two statutory mitigating circumstances existed, it was controverted by other evidence. N.C.G.S. § 15A-2000(f)(2), N.C.G.S. § 15A-2000(f)(6).

**Am Jur 2d, Trial § 1441.**

**31. Criminal Law § 680 (NCI4th)— capital sentencing—nonstatutory mitigating circumstance—abuse of defendant and siblings as children—no peremptory instruction**

There was no error in a capital sentencing proceeding where the trial court did not give peremptory instructions on the nonstatutory mitigating circumstance that defendant's father physically abused defendant and the other children in the family where the testimony of a clinical social worker was prepared for trial and therefore lacks the indicia of reliability and is not manifestly credible, defendant's mother was unable to describe any specific instances of abuse against defendant or the other children, and defendant presented no medical records or other evidence of specific instances of abuse. Furthermore, the testimony of defendant's mother may have been influenced by her obvious bias.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**32. Criminal Law § 1373 (NCI4th)— death penalty—not disproportionate**

A death sentence was not disproportionate where the record fully supports the four aggravating circumstances found by the jury, the jury's failure to find certain submitted mitigating circumstances was a rational result from the evidence, and there is no indication that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary consideration. This case is distinguishable from each of those cases in which the North Carolina Supreme Court has found the death penalty dis-

STATE v. BISHOP

[343 N.C. 518 (1996)]

proportionate. Defendant here was convicted on the theory of premeditation and deliberation as well as under the felony murder rule, and the jury findings of a prior conviction of a violent felony, that the murder was committed for the purpose of avoiding a lawful arrest, and that the victim was surprised in her own home before she was kidnapped and murdered were significant.

**Am Jur 2d, Criminal Law § 628.**

**33. Criminal Law § 1286 (NCI4th)— habitual felon sentencing—evidence of prior adjudication as habitual felon**

There was no prejudicial error during a habitual felon proceeding in the admission of evidence showing that defendant previously had been adjudicated to be a habitual felon where defendant's confrontation rights were not at jeopardy because he was also the defendant in the prior proceeding, there was no prejudice in that the State presented evidence of defendant's prior convictions and defendant does not contend that any of the prior convictions supporting the habitual felon adjudication do not exist. The admission of evidence showing that defendant previously had been adjudicated a habitual felon could not have affected the outcome.

**Am Jur 2d, Habitual Criminals and Subsequent Offenders §§ 20-22.**

**34. Criminal Law § 1073 (NCI4th)— sentencing—forfeiture of vehicles used in felony**

The trial court did not err in ordering the forfeiture of defendant's truck and automobile under N.C.G.S. § 14-86.1 where defendant was found guilty of robbery with a dangerous weapon. Both vehicles were used in the armed robbery; defendant drove to the victim's house in the truck and he effected his escape in the car after his girlfriend drove it to pick him up.

**Am Jur 2d, Forfeitures and Penalties §§ 15, 17.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Rousseau, J., on 27 April 1994 in Superior Court, Guilford County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments and sentences was allowed 25 April 1995. Heard in the Supreme Court 15 November 1995.

*Michael F. Easley, Attorney General, by Ellen B. Scouten, Special Deputy Attorney General, for the State.*

*Sam J. Ervin, IV, for defendant-appellant.*

ORR, Justice.

The State's evidence, predominantly through the testimony of Kenneth Kaiser, defendant's younger brother, tended to show the following. In August of 1991, defendant and Kaiser worked on a paint crew that painted the home of Nan Martin Schiffman, the victim. On one occasion while they were painting, defendant told Kaiser that Schiffman had some jewelry and expensive items in the house and that they could get her key duplicated and come back later and get what they wanted. Kaiser and defendant agreed they should wait a month or more so that they would not be suspected. Later that day, defendant left; when he returned, he showed Kaiser a copy of the house key that he had made.

On 3 October 1991, both defendant and Kaiser lost their jobs. On 6 October, they applied for a job selling vacuum cleaners, and on 7 October, they went for a training session. At lunch, Kaiser told defendant that the job was not what they thought it was going to be and that maybe it would be a good time to go into Schiffman's house and get what they could because they needed some money. When defendant agreed, Kaiser asked what would happen if Schiffman came home and recognized them. Defendant responded that they could kill her, and Kaiser agreed.

About 3:00 p.m. on that day, defendant and Kaiser drove defendant's Datsun pickup truck to Schiffman's house. Kaiser got out and let himself into the house with the duplicate key while defendant parked the truck at another location and returned on foot. Kaiser took some jewelry while defendant placed a box of silver by the back door. As they continued to look for things to steal, Schiffman drove into the driveway. Defendant and Kaiser hid in the master bedroom and bathroom, defendant holding a loaded .32-caliber revolver and Kaiser holding a loaded .22-caliber revolver.

After Schiffman entered the house, defendant and Kaiser came out of the master bedroom, and defendant told Schiffman that if she would be quiet, she would not get hurt. Kaiser went through her purse and took two one-hundred-dollar bills and her Citibank card. Kaiser asked her for the personal identification number used to get money

out of a teller machine with the card. She responded that she did not know, but that it would be in her files.

Defendant said they should move out of the sunroom so that no one would see them. Schiffman began to run down the hall, but defendant caught her and put his gun against her and told her that if she tried that again, they would kill her. Then defendant and Kaiser took Schiffman to a bedroom where she told them where to find the personal identification number. Defendant said that they were going to the bank. He loaded the silver into the trunk of Schiffman's car, and Kaiser put Schiffman into the car.

Defendant drove Kaiser and Schiffman to the Troxler farm. They took Schiffman into the house, which was abandoned. Defendant told Kaiser to move the car and take the silver out of the trunk. When Kaiser returned, defendant was zipping up his pants, and Schiffman was pulling up her pants. Defendant asked Kaiser if he wanted oral sex, and Kaiser said he did not. Defendant then whispered to Kaiser, "She knows who we are. We're going to have to do that." Defendant told Kaiser to take Schiffman out to a pit beside the house and "do it." The evidence is conflicting as to who actually pulled the trigger, killing Schiffman. Kaiser's first statement to police indicated that defendant killed Schiffman. Kaiser subsequently gave a revised statement that he shot Schiffman. Kaiser also testified at trial that he killed her. A prison inmate testified that defendant told him, "I killed the b----." Dr. Butts, the medical examiner, testified that the wound was caused by a bullet of at least .32-caliber in size. Kaiser testified that on the day of the murder, he carried a .22-caliber revolver and defendant carried a .32. After she was killed, defendant and Kaiser put Schiffman's body in the pit and covered it. Then, they drove Schiffman's car to Winston-Salem.

After parking the car at Hanes Mall, defendant and Kaiser wiped off their fingerprints, withdrew $200.00 from an automatic teller machine (ATM) with Schiffman's Citibank card, went to a restaurant to drink beer, and then withdrew another $500.00. They called the vacuum cleaner sales company to see if they had the job because defendant thought it would look suspicious to spend money without a job. They paid for this call at a pay phone rather than calling collect because defendant said a collect call would place them in Winston-Salem at the time the card was used. Defendant then called Robin Heath and asked her to pick them up. When Heath arrived in defend-

ant's Cadillac, defendant drove them back to Greensboro in his Cadillac, and they picked up the Datsun truck.

The next day, defendant gave Kaiser the keys to Schiffman's car and told him to leave the window down and the keys in it so someone would steal it and get their fingerprints on it; Kaiser did so. Then defendant and Kaiser went back to the Troxler farm, tried to shovel more dirt over Schiffman's body, and retrieved the box of silver. The following day, they bought twenty bags of potting soil and ten or fifteen bags of lime from Lowe's because defendant said the lime would make the body decompose faster. They subsequently spread the lime and the soil into the pit where Schiffman was buried.

Between 7 October and 23 October, defendant and Kaiser used Schiffman's Citibank card to withdraw $17,050 from automatic teller machines (ATMs). Investigators used a computer program to determine when and where the card was being used. They learned that the card was being used at the Wachovia ATM in Yanceyville and contacted the tellers there. On 23 October 1991, one of the tellers gave a description of two men and the truck they drove. Later that day, officers located and stopped the truck and arrested the occupants, defendant and Kaiser, for financial transaction card fraud and carrying concealed weapons. When police conducted a search incident to the arrest of Kaiser, they found Schiffman's credit card in his shoe. Kaiser's fingerprints matched those lifted from Schiffman's car. Some of Schiffman's personal property was found in the truck that defendant and Kaiser were stopped in, as well as in defendant's home. Kaiser told his cellmate where the body was buried, the cellmate told a police detective, and police found the body.

Defendant presented an alibi defense. The parents of defendant's girlfriend testified that they helped defendant work on his girlfriend's car on the day of the murder from 5:00 p.m. until 6:00 p.m. A co-worker of Schiffman's testified that Schiffman left work to go home around 4:00 p.m. Kaiser testified that he and defendant broke into the house around 3:30 p.m. Defendant argued that he could not have been home to work on his girlfriend's car by 5:00 p.m. if Kaiser's story were true. Defendant argued that Kaiser committed the murder alone.

The jury found defendant guilty of first-degree murder based both upon premeditation and deliberation and upon the felony murder rule. The jury also found defendant guilty of breaking and entering, robbery with a dangerous weapon, first-degree kidnapping, financial transaction card fraud, and conspiracy, as well as guilty of being a

habitual felon by reason of the convictions for breaking and entering and financial transaction card fraud. Judge Rousseau sentenced defendant to death for the first-degree murder conviction. Judge Rousseau also sentenced defendant to forty years imprisonment on the conviction of robbery with a dangerous weapon, thirty years on the conviction of second-degree kidnapping, a life sentence on the conviction of felonious breaking or entering while being a habitual felon, a life sentence on the conviction of financial transaction card fraud while being an habitual felon, and one year on the conviction of conspiracy, all sentences to run consecutively.

## JURY SELECTION

### I.

**[1]** Defendant first contends that the trial court violated *Morgan v. Illinois*, 504 U.S. 719, 119 L. E. 2d 492 (1992), during defendant's *voir dire* of prospective juror Whitaker. The court sustained the State's objection to the defendant's question, "Would you find it difficult to consider voting for life imprisonment for a person convicted of first-degree murder?" Defendant has shown neither an abuse of discretion nor prejudice, both of which are required to establish reversible error relating to *voir dire. See, e.g., State v. Miller*, 339 N.C. 663, 678, 455 S.E.2d 137, 145, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 169 (1995).

In *Morgan v. Illinois*, the Supreme Court held that during *voir dire* in a capital case, the trial court's refusal to permit inquiry into whether a prospective juror would automatically vote to impose the death penalty upon defendant's conviction regardless of the evidence of mitigating circumstances is inconsistent with the Due Process Clause of the Fourteenth Amendment. "Within this broad principle, however, the trial court has broad discretion to see that a competent, fair, and impartial jury is impaneled; its rulings in this regard will not be reversed absent a showing of abuse of discretion." *State v. Yelverton*, 334 N.C. 532, 541, 434 S.E.2d 183, 188 (1993).

In the case at bar, the trial court did not refuse *Morgan* inquiry. The court permitted defendant to ask juror Whitaker and other jurors other questions that gave defendant a fair opportunity to make the *Morgan* inquiries. The court sustained the objection to the question at issue because it disagreed with the wording. The court told the jury, "All these cases are difficult . . . ," and allowed defendant to make the inquiry with more specific wording. We conclude that the trial court did not abuse its discretion in making this clarification and that

defendant was not prejudiced because the *Morgan* inquiry was allowed. Therefore, this assignment of error is overruled.

## II.

[2] Next, defendant contends that the trial court improperly limited defendant's *voir dire* of several prospective jurors. Again, defendant must show abuse of discretion and prejudice to establish reversible error relating to *voir dire*. We find that he has failed to do so.

First, defendant contends that the trial court erred by not allowing defendant to question prospective jurors concerning the content of the pretrial publicity to which they had been exposed. However, the record reveals no such limitation. Before the jury selection proceedings began, the court stated:

All right. As I said earlier, I assume there's been a lot of publicity on this case, Mr. Maddox. And as I told you back in January, I'll let you ask the jurors how many of them have heard about the case, how they heard about it, when they heard about it, if they heard about it this morning or last night. You can ask them if they've formed any opinion about the case. And I'll rule on it from there. You can ask them who told them—I mean, whether they heard by word of mouth, newspaper, radio, television or whatnot.

Defendant cites no instance where a question he asked was not allowed. We do not find any abuse of discretion here, and because defendant did not show that he was forced to accept any juror who expressed or formed an opinion based on pretrial publicity, he has shown no prejudice. *See State v. Jerrett*, 309 N.C. 239, 255, 307 S.E.2d 339, 347-48 (1983) (to show prejudice, defendant must show that a juror objectionable to defendant sat on the jury).

[3] Second, defendant contends that the trial court refused to allow significant questioning about the relationships between prospective jurors and the law enforcement community, thus depriving defendant of an opportunity to determine whether the venire contained "prosecution-prone" jurors. The record reveals that the court allowed defendant to ask questions to determine whether any juror had any bias in favor of law enforcement, whether any juror knew anyone who was a law enforcement officer, and whether any juror knew any law enforcement officer on the witness list, but refused to allow defendant to ask which division or department employed a law enforcement officer whom prospective juror Latta knew. Nothing in Ms. Latta's responses indicated that she was partial or biased.

Therefore, the trial court did not abuse its discretion in refusing to allow this question.

**[4]** Third, prospective juror Tanner indicated that she had had a friend who had been a victim of a homicide but stated that she would try to do her best to base her verdict only on the evidence and instructions in the present case. Defendant claims the trial court erred in sustaining an objection to the question, "Are there factors that you think may interfere with that ability?" In sustaining the objection, the court said, "Well, she said she'd do her best to be fair about it." Prospective juror Tanner subsequently responded "Yes" when defendant's counsel asked her, "[C]an you look at Mr. Steven Mark Bishop right now in the eye and assure him that you would be able to—if you sat on this case, that you would be fair to him?" Assuming *arguendo* that sustaining the objection was error, Tanner's ability as a fair juror was adequately addressed, and defendant has failed to show prejudice.

**[5]** Fourth, defendant assigns error to the trial court's refusal to allow defendant to ask prospective jurors if any juror was a member of any type of club, social club, or community civic or political organization. The court said that defendant could "ask them if they belong to any groups that are opposed or in favor of the death penalty, something like that." After reviewing the *voir dire* transcript, we find no abuse of discretion. A defendant may question prospective jurors concerning their fitness and competency to serve as jurors in the case to determine whether there is a basis for a challenge for cause or whether to exercise a peremptory challenge. N.C.G.S. § 15A-1214(c) (1988). The court declined to allow a question that was not closely tied to the prospective jurors' fitness and competency to serve as jurors or to their ability to render a fair and impartial verdict, but did allow similar questions that were more closely tied and that provided adequate inquiry into the jurors' fitness and competency. This action did not constitute an abuse of discretion.

**[6]** Finally, defendant claims the trial court erroneously limited the scope of defendant's *voir dire* of prospective juror Hodgin. Hodgin was an alternate throughout the case and did not deliberate or return a verdict against defendant. Therefore, assuming *arguendo* that the court erred, defendant has shown no prejudice.

## III.

**[7]** Next, defendant contends the trial court erred in failing to instruct the jury venire on the meaning of a life sentence. While the prosecutor, Mr. Goodman, was interviewing prospective juror Pleasants during *voir dire,* the following exchange occurred:

MR. GOODMAN: All right. Now, do you have any personal views about capital punishment that would either prevent or substantially impair your ability to perform your duties as a juror in this case, in accordance with Judge Rousseau's instructions?

MS. PLEASANTS: I have mixed emotions about capital punishment—

MR. GOODMAN: All right.

MS. PLEASANTS:—in—Do you want me to tell you what they are?

MR. GOODMAN: Well, if you can elaborate just a bit.

MS. PLEASANTS: Well, I feel that I would prefer parole—I mean, life without—

THE COURT: Well, wait just a minute now.

MS. PLEASANTS: Okay. Capital punishment—

THE COURT: No. Wait a minute.

MS. PLEASANTS: Okay.

THE COURT: Do you believe in capital punishment?

MS. PLEASANTS: In some circumstances.

THE COURT: In other words, depending on the facts of the case?

MS. PLEASANTS: Yes. As you put it before, I agree with you, as North Carolina puts it.

THE COURT: Well, in other words, you hear the evidence, you hear the aggravating and mitigating [circumstances], weigh them and consider them, and you could impose the death penalty, if that's what the evidence called for?

MS. PLEASANTS: If that were the best option. I don't know what the law is, as far as the options.

**STATE v. BISHOP**

[343 N.C. 518 (1996)]

THE COURT: Well—

MS. PLEASANTS: If it's the most heinous crime and there were no other better options, I would consider life without parole—then I would vote for the death penalty.

THE COURT: Well—

MS. PLEASANTS: I don't know.

THE COURT:—the jury would be called upon to make a recommendation as to punishment, either life imprisonment or death. Now, could you consider both of those?

MS. PLEASANTS: Yes, I could.

THE COURT: And if the facts and the evidence and the law called for it, could you impose the death penalty?

MS. PLEASANTS: Yes, I could.

THE COURT: All right.

Go ahead, Mr. Goodman.

MR. GOODMAN: If I could just ask one further point in clarification. You wouldn't automatically vote for life imprisonment as a result of your mixed emotions on this topic?

MS. PLEASANTS: Well, I don't know what the judge would instruct us yet, so it would be very difficult to say that right now, what the options would be. But if it were a terrible crime and there were no better options, that would be what I would vote for.

MR. GOODMAN: Okay. And you understand that the judge would instruct you that the choices are between the death penalty and life imprisonment, as opposed to the way you termed it, of life without parole? Do you understand that?

MS. PLEASANTS: Yes.

[DEFENSE COUNSEL]: Object.

MS. PLEASANTS: I don't know if I—

THE COURT: Well, the only thing is that the recommendation will be either death or life imprisonment. That's it.

Ms. PLEASANTS: Then I would be fine with that. I would—the way you described it, I could go with that. I would agree with that.

THE COURT: You could consider both, and if it called for—

Ms. PLEASANTS: Yes.

THE COURT:—the law and the evidence called for death, you could vote for death; if it called for life, you could vote for life?

Ms. PLEASANTS: Yes.

Defendant did not ask the trial court to instruct Ms. Pleasants or the jury panel on the meaning of life imprisonment. However, on appeal, defendant argues that as a result of this exchange, the trial court had a duty to instruct the jury on the meaning of a life sentence. We disagree.

We find *State v. Burr*, 341 N.C. 263, 461 S.E.2d 602 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 526 (1996), to be directly on point. In *State v. Burr*, we found no error in the trial court's failure to instruct the jury on the meaning of a life sentence after a prospective juror asked, during *voir dire* by defendant, if life imprisonment was "without privilege of parole," and counsel for the defense responded:

The judge will have to instruct you with regards [sic] to the life imprisonment or the possibility of life imprisonment. Whether or not he mentioned that or not, would you be able to follow the judge's instructions as they . . . apply to this case? [The prospective juror responded affirmatively.]

*Id.* at 287-88, 461 S.E.2d at 615.

"A defendant's eligibility for parole is not a proper matter for consideration by a jury." *State v. Campbell*, 340 N.C. 612, 632, 460 S.E.2d 144, 154 (1995), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 871 (1996). In the case at bar, the trial court's direction of the *voir dire* of prospective juror Pleasants adequately communicated to Pleasants and the jury panel that jurors were not to consider parole in their deliberations. Furthermore, defendant has not persuaded us that the court's failure to give any further instruction caused the jury to consider the possibility of parole in its deliberations. On these facts, we find no error in the court's failure to specifically instruct the jury on the meaning of a life sentence.

## GUILT-INNOCENCE PROCEEDING

## IV.

[8]   Defendant contends that the trial court erred by admitting testimony by the State's witnesses, Terry Mack Alton and Sam Roberts, that defendant and his younger brother, Kenneth Kaiser, had a codependent relationship, that it was like a father/son relationship, and that defendant dominated Kaiser. Defendant argues that this testimony amounts to expert opinion from persons who are not qualified by any psychiatric or psychological training to give such opinions. We disagree.

Rule 701 of the Rules of Evidence provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701 (1992). In *State v. Jennings*, 333 N.C. 579, 607, 430 S.E.2d 188, 201, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 602 (1993), we held proper the admission of testimony by a witness describing a meeting between the witness, the defendant, and the defendant's husband and stating that defendant had no compassion for her husband. We concluded that

this witness's "opinions or inferences" as to the emotions displayed by defendant toward her husband, and her husband's responses, manifested by a change in his physical aspect, were rationally based on the witness's perceptions and were helpful to a clear understanding of his testimony or the determination of a fact in issue.

*Id.*

In the case at bar, the testimony meets the requirements of parts (a) and (b) of Rule 701. The testimony was rationally based on the perception of the witnesses. The witnesses worked with defendant and Kaiser, saw them interact, and heard their conversations. The testimony was rationally based on these observations. The testimony was also helpful to a clear understanding of a fact in issue: whether Kaiser acted at the direction of defendant when he committed the crimes with defendant. This fact was in issue because it supported the "acting in concert" theory of the State's case. The testimony was

therefore admissible opinion testimony by lay witnesses under Rule 701. This assignment of error is overruled.

## V.

[9]  Defendant next contends that the trial court erred by expressing an opinion with respect to defendant's guilt in front of a member of the petit jury. We disagree.

At a lunch recess, juror Hawkins approached the trial judge, concerned that his employer would only pay him for two of the weeks he served on jury duty. At the conclusion of the day's proceedings, after the rest of the jury had left, the judge discussed the problem with juror Hawkins. Judge Rousseau made the following statement to juror Hawkins:

[T]he clerk's office here has talked to [the president of your company]. Of course, he says that they have a certain policy, which I can't interfere with. He says you can take some vacation time or maybe work some extra time about it. How about calling him again about it and see if you can work something out satisfactory.

You know, we have these crimes occur in each county in North Carolina. Looks like all over the country. We have the jury trials. Somebody's got to serve on jury duty. I'm not fussing at you about it. But, you know, these business people want criminals locked up, don't like breaking and entering, people stealing their—

At that point, the judge was interrupted by the bailiff approaching the bench, and the conversation ended. On the next morning, juror Hawkins informed the court that he had everything worked out with his employer.

"The judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (1988). In *State v. Campbell*, 340 N.C. at 628-29, 460 S.E.2d at 152-53, we held that the court's comment about "this particular sad situation" was not an expression of opinion, but an innocuous, universal sentiment regarding a murder.

Similarly, in the case at bar, read in context, the trial judge expressed no opinion on any question of fact to be decided by the jury; instead he commented on the attitude he perceived employers to have. Immediately before the conversation with juror Hawkins that is at issue, the trial judge instructed the jury that he may have "fussed"

at one of the lawyers more than another because he gets impatient, not because he had an opinion, and that the jury should not infer it to mean he had an opinion. The judge also instructed the jurors during the guilt-innocence phase charge that he had no opinion as to what their verdict should be. We conclude that the judge's comment was neither intended nor interpreted as an opinion about any fact to be decided by the jury. This assignment of error is overruled.

## VI.

[10] Defendant contends that his trial counsel deprived him of effective assistance of counsel by conceding defendant's guilt of financial transaction card fraud without defendant's consent during his closing argument to the jury. We disagree. The relevant portion of the argument follows:

> But I say to you that after that the only thing the State has put into evidence that connects Steven Mark Bishop to the Nan Schiffman case whatsoever is spending money. Spending money that seems so obvious to have come from Kenny Kaiser using her credit card to obtain money out of her account.

> And you heard him testify. Kenny Kaiser said he used the card every time and that he would then give a cut to his brother. Give money to his brother. He gave money to his brother to buy the truck from him. He gave money to him each time he used the card.

> The State did put on that evidence. The State does have that evidence. And they have credible and believable witnesses that have testified to that. You weigh that evidence as to how that evidence applies to the crime charged of financial transaction card fraud.

> If you believe from that evidence that that proves beyond a reasonable doubt to you that Steven Mark Bishop is guilty of financial transaction card fraud, then that will be for you to find.

> But I say to you getting money and spending money that your brother gives you that he's stealing does not make you a murderer; does not make you a kidnapper; does not make you an armed robber. It doesn't mean you broke and entered in anybody's house. It makes you nothing more than a fool. That's the State's case.

In his closing argument, defendant's counsel did not concede defendant's guilt of financial transaction card fraud. He simply stated that the State put on evidence that Kaiser gave money to defendant when Kaiser used the card, that the jury would apply that evidence to the crime charged of financial transaction card fraud, and that if the jury believed that the evidence proved beyond a reasonable doubt that defendant was guilty of financial transaction card fraud, then that would be for the jury to find. This was a correct statement of the law, not a concession of guilt. Defendant's counsel then emphasized that even if defendant had received and spent the money, that did not show that defendant committed the other crimes charged against defendant. The argument attempted to separate the evidence of receiving and spending money from the crimes charged against defendant other than financial transaction card fraud. We conclude that defendant's counsel did not concede defendant's guilt to financial transaction card fraud during his closing argument; therefore, this assignment of error is overruled.

## VII.

**[11]** Defendant next contends that the trial court erred in failing to intervene *ex mero motu* to stop the prosecutor from making three improper arguments to the jury during his closing argument. We disagree.

Since defendant failed to object, he must demonstrate that the prosecutor's arguments amounted to gross impropriety. *E.g., State v. Rouse,* 339 N.C. 59, 91, 451 S.E.2d 543, 560 (1994), *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 60 (1995). In making this inquiry, it must be stressed that prosecutors are given wide latitude in their argument. *Id.* Counsel have wide latitude to argue the law, the facts, and reasonable inferences supported thereby. *State v. Frye,* 341 N.C. 470, 498, 461 S.E.2d 664, 678 (1995), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 526 (1996). Prosecutors may create a scenario of the crime committed as long as the record contains sufficient evidence from which the scenario is reasonably inferable. *State v. Ingle,* 336 N.C. 617, 645, 445 S.E.2d 880, 895 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 222 (1995).

Defendant first claims that the prosecutor's argument that defendant, rather than Kaiser, pulled the trigger was improper because it used evidence admitted for corroborative or impeachment purposes—Kaiser's first statement to police—as substantive evidence. N.C.G.S. § 8C-1, Rule 607, provides: "The credibility of a wit-

ness may be attacked by any party, including the party calling him." However, prior statements of a witness which are inconsistent with his present testimony may only be used to impeach the witness' credibility. They are not admissible as substantive evidence because of their hearsay nature. *State v. Buckner*, 342 N.C. 198, 223, 464 S.E.2d 414, 428 (1995); *State v. Williams*, 341 N.C. 1, 9, 459 S.E.2d 208, 213 (1995), *cert. denied*, ⸺ U.S. ⸺, 133 L. Ed. 2d 870 (1996). Defendant claims that the prosecutor's argument relied on the fact that Kaiser stated in his first statement to police that defendant killed Schiffman, a fact admitted to impeach Kaiser's trial testimony that Kaiser killed Schiffman.

Any argument by the prosecutor that defendant pulled the trigger was adequately supported by facts in evidence other than Kaiser's first statement to police. Dr. Butts testified that the wound was caused by a bullet of at least .32-caliber in size. Kaiser testified that on the day of the murder, he carried a .22-caliber revolver and defendant carried a .32. Also, Timothy Watlington testified that defendant told him that defendant killed Schiffman, and Ronald Haith testified that defendant told him that Kaiser had told another inmate where the body of the woman "they had killed" was located. The prosecutor's argument was a reasonable inference supported by this evidence; therefore, the argument was not improper.

[12] Defendant also claims that the prosecutor improperly described his own role as Schiffman's personal representative by stating, "I have a different function and a different role than [defendant's counsel]. I have to see that justice is done for Nan Martin Schiffman. Not just to Mr. Bishop." Counsel may defend their own tactics when challenged. *State v. Payne*, 312 N.C. 647, 665, 325 S.E.2d 205, 217 (1985). The prosecutor's argument was a response to the allegations by defendant's counsel that the prosecutor had made an improper deal with Kaiser. The argument was not grossly improper so as to require *ex mero motu* intervention.

[13] Finally, defendant claims the prosecutor's argument was improper because he implicitly criticized defendant's decision to exercise his right to a fair trial by an impartial jury when he argued that Schiffman died without a trial. Defendant concedes that we held that a similar argument was not grossly improper in *State v. Basden*, 339 N.C. 288, 451 S.E.2d 238 (1994), *cert. denied*, ⸺ U.S. ⸺, 132 L. Ed. 2d 845 (1995). We decline to reconsider our holding in *Basden*,

and we hold that the prosecutor's argument in this case also fell short of the gross impropriety standard.

For the foregoing reasons, defendant's contention that the trial court erred in failing to intervene *ex mero motu* in the prosecutor's closing argument has no merit.

## VIII.

[14]   Defendant also contends that the trial court's jury instructions on the acting in concert theory erroneously failed to require the jury to find that defendant had the intent necessary to support a finding of guilty of the crimes of felonious breaking and entering, conspiracy, first-degree murder, and financial transaction card fraud. We disagree.

Although he failed to object on these grounds at trial, we elect to review this assignment of error because defendant was sentenced to death. *See State v. Gregory*, 342 N.C. 580, 585, 467 S.E.2d 28, 31 (1996). Defendant challenges the court's general, introductory instructions on the acting in concert theory, which stated:

> Now, members of the jury, the law in this state—there is a law in this state called "acting in concert." That is, for a person to be guilty of a crime, it is not necessary that he himself do all the acts necessary to constitute that crime. If a defendant is present with one or more persons, and they act together with a common purpose to commit breaking and entering, each of them is held responsible for the acts of the others done in the commission of that crime, breaking or entering, as well as conspiracy to commit breaking and entering, robbery, murder, financial transaction card fraud, and kidnapping, as well as any other crime committed by the other in furtherance of that common purpose.

This instruction is substantially similar to the pattern jury instruction and to the jury instruction held proper in *State v. McCarver*, 341 N.C. 364, 386-87, 462 S.E.2d 25, 37-38 (1995), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 482 (1996). Moreover, the court's instructions on the individual crimes of felonious breaking and entering, conspiracy, first-degree murder, and financial transaction card fraud clearly required the jury to find that defendant had the specific intent to commit the crimes in order to find him guilty. We find no merit in defendant's argument.

## SENTENCING PROCEEDING

## IX.

**[15]** Defendant contends that the trial court erred by submitting to the jury the statutory aggravating circumstance set forth in N.C.G.S. § 15A-2000(e)(3), which provides that the "defendant had been previously convicted of a felony involving the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3) (1988) (amended 1994). We disagree. Defendant argues that the submission of the (e)(3) aggravating circumstance was error because he had not been convicted of the prior felony at the time this murder occurred. Defendant committed the felony (assault with a deadly weapon with the intent to kill inflicting serious injury) on 4 July 1991. This murder occurred on 7 October 1991. Defendant was convicted of the felony assault on 31 March 1992.

In *State v. Goodman*, 298 N.C. 1, 22, 257 S.E.2d 569, 583 (1979), we held that N.C.G.S. § 15A-2000(e)(3)

> requires that there be evidence that (1) defendant had been convicted of a felony, that (2) the felony for which he was convicted involved the "use or threat of violence to the person," and that (3) the conduct upon which this conviction was based was conduct which occurred prior to the events out of which the capital felony charge arose.

In applying these requirements, we found in *State v. Silhan*, 302 N.C. 223, 266, 275 S.E.2d 450, 480 (1981), that there was evidence of the (e)(3) aggravating circumstance where the defendant committed kidnapping, crime against nature, and assault with intent to rape in September of 1976; committed the murder for which he was being sentenced on 13 September 1977; and was tried for the prior felonies, of which he was convicted, in October of 1977. Because the order of these events is the same, we find that *State v. Silhan* is directly on point. The timing element is addressed in the third evidentiary requirement: "[T]he conduct upon which this conviction was based was conduct which occurred prior to the events out of which the capital felony charge arose." *Id.* The evidence shows that the conduct upon which the assault conviction was based occurred on 4 July 1991, prior to 7 October 1991, the date of the events out of which the capital felony charge arose. Therefore, the evidence supported submission of N.C.G.S. § 15A-2000(e)(3), and this assignment of error is overruled. *See also State v. Burke*, 343 N.C. 129, 157-60, 469 S.E.2d

901, 915-17 (1996); *State v. Lyons*, 343 N.C. 1, 22, 468 S.E.2d 204, 214 (1996).

## X.

**[16]** Defendant contends that, under the rule announced in *State v. Quesinberry*, 319 N.C. 228, 354 S.E.2d 446 (1987), the trial court erred by permitting the jury to consider as statutory aggravating circumstances that the murder was committed while the defendant was engaged in the commission of kidnapping, N.C.G.S. § 15A-2000(e)(5), and that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6). Defendant argues that these circumstances·were redundant because the felony underlying the (e)(5) circumstance was motivated by a desire to obtain something of monetary value. We disagree.

> In *Quesinberry*, we held that the trial court erred in submitting the aggravating circumstances 1) that the murder was committed during the course of a robbery and 2) that the murder was committed for pecuniary gain. Because the evidence showed that the defendant committed the robbery for the purpose of pecuniary gain, as opposed to some other purpose, the circumstances were redundant. 319 N.C. at 238, 354 S.E.2d at 452. In effect, the trial court permitted the jury to use the same evidence—that the defendant killed for pecuniary gain—to aggravate the murder twice. *Id.* at 239, 354 S.E.2d at 452-53.

*State v. Sanderson*, 336 N.C. 1, 21, 442 S.E.2d 33, 45 (1994). However, if the circumstances are supported by different evidence, they cannot be redundant. *Id.*; *State v. Jennings*, 333 N.C. at 627-28, 430 S.E.2d at 213-14.

In the case at bar, the evidence underlying the (e)(5) and (e)(6) aggravating circumstances was not the same. In the sentencing instructions to the jury, the trial court limited the evidence which the jury could rely on in considering the (e)(5) circumstance to kidnapping for the purpose of facilitating defendant's commission of financial transaction card fraud. The court also limited the evidence on which the jury could rely in considering the (e)(6) circumstance to the taking of the "jewelry, silver, and credit cards". Assuming *arguendo*, without so holding, that the evidence of the taking of credit cards is also evidence of financial transaction card fraud, the evidence of the taking of the jewelry and silver, apart from the evidence of the taking of the credit cards, supports a finding that the

capital felony was committed for pecuniary gain. Thus, the case at bar is distinguishable from *State v. Quesinberry*, where this Court found a complete overlap of evidence supporting two aggravating circumstances. *See State v. Jennings*, 333 N.C. at 628, 430 S.E.2d at 214 (trial court did not err in submitting two aggravating circumstances where there was sufficient independent evidence apart from the overlapping evidence to support a finding of the existence of each aggravating circumstance). Therefore, it was not error to submit both aggravating circumstances.

We note, as we did in *State v. Jennings*, that the trial court should have instructed the jury that it could not use the same evidence as the basis for finding both circumstances. However, because there was sufficient independent evidence to warrant a finding of each aggravating circumstance, the court's failure to give such an instruction did not prejudice defendant. *Id.* This assignment of error is overruled.

## XI.

**[17]** Defendant next contends that the trial court erred by refusing to submit to the jury certain nonstatutory mitigating circumstances requested by defendant. Defendant argues that the court was required to submit the requested circumstances because "where a defendant makes a timely *written* request for a listing *in writing* on the form of possible nonstatutory mitigating circumstances that are supported by the evidence and which the jury could reasonably deem to have mitigating value, the trial court must put such circumstances in writing on the form." *State v. Cummings*, 326 N.C. 298, 324, 389 S.E.2d 66, 80 (1990). We will address each requested nonstatutory mitigating circumstance separately.

First, the defendant requested as a nonstatutory mitigating circumstance that the "co-defendant or accomplice in the crimes for which the defendant has been convicted will avoid the death penalty based upon the plea agreement entered into by the State with the co-defendant or accomplice." We have consistently held that evidence of a codefendant's sentence for the same offense is not relevant to the jury's sentencing determination in the case before it. *State v. Ward*, 338 N.C. 64, 114, 449 S.E.2d 709, 737 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 1013 (1995). As we did in *State v. Simpson*,

[w]e decline to depart from this precedent and reiterate that such information deals with matters unique to another person and

does not in any way reflect upon defendant's character, record, or background. It is, accordingly, irrelevant as to sentencing.

*State v. Simpson,* 341 N.C. 316, 353, 462 S.E.2d 191, 212 (1995), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 194 (1996). This assignment of error has no merit.

**[18]** Second, defendant claims he requested the nonstatutory mitigating circumstance that the "defendant's father sexually abused Mark's older sister Debbie." However, the record reveals that defendant's written request states this requested circumstance differently: "The defendant's father sexually abused Mark's older sister Debbie and there is evidence that he also sexually abused Mark and his older brother Sonny." Defendant has failed to show that the evidence supported this requested nonstatutory mitigating circumstance as written. Defendant does not argue that any evidence supports the assertion that defendant's father sexually abused defendant and his older brother, Sonny. Furthermore, defendant argues that his father's sexual abuse against his sister has mitigating value because it led to his parents' divorce and to defendant's personal feelings of guilt for his father leaving him. However, the trial court did submit the nonstatutory mitigating circumstance that asked, "Was the defendant's father significantly absent from Mark's life from age five to the present, and does that have mitigating value?" Thus, the indirect mitigating value that defendant argues that his father's abuse of defendant's sister may have had was subsumed in the submitted mitigating circumstances.

In *State v. Green,* 336 N.C. 142, 183, 443 S.E.2d 14, 38, *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 547 (1994), we found that certain submitted mitigating circumstances as well as the catchall mitigating circumstance provided a vehicle for the jury to consider all of the evidence tending to support a requested nonstatutory mitigating circumstance which was not submitted. We held that the trial court's error in failing to submit the defendant's requested nonstatutory mitigating circumstance was harmless beyond a reasonable doubt because it was clear that the jury was not prevented from considering any potential mitigating evidence. *Id.; accord State v. Hill,* 331 N.C. 387, 417, 417 S.E.2d 765, 780 (1992), *cert. denied,* 507 U.S. 924, 122 L. Ed. 2d 684 (1993). Likewise, in the case at bar, the catchall mitigating circumstance was submitted, and the jury was not precluded from considering any mitigating evidence. Therefore, assuming *arguendo* that the trial court erred, the error was harmless beyond a reasonable doubt.

**[19]** Third, defendant requested the nonstatutory mitigating circumstance that "[d]ue to his mental and emotional disturbances, the defendant has significantly poorer impulse control than others." The trial court stated that it refused to submit this circumstance because it was covered under the submitted statutory mitigating circumstances N.C.G.S. § 15A-2000(f)(2), "Was the capital felony committed while the defendant was under the influence of a mental or emotional disturbance?" and N.C.G.S. § 15A-2000(f)(6), "Was the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law impaired?" It is not error for a trial court to refuse to submit a requested nonstatutory mitigating circumstance that has been incorporated into a statutory mitigating circumstance that was submitted to the jury. *See State v. Skipper*, 337 N.C. 1, 55-56, 446 S.E.2d 252, 282-83 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995). We find no error in the trial court's decision that the requested nonstatutory mitigating circumstance was incorporated in the submitted statutory (f)(2) and (f)(6) circumstances and therefore should not be submitted separately.

**[20]** Fourth, defendant requested the nonstatutory mitigating circumstance that the "defendant's family loves and cares about the defendant." A review of the record reveals that the evidence that defendant claims supports this circumstance relates only to defendant's family relationships in his childhood, not at the time of the crime or of trial. Furthermore, because the court instructed on the "catchall" circumstance, N.C.G.S. § 15A-2000(f)(9), which no juror found to exist, the trial court's ruling did not prevent defendant from presenting, or the jury from considering, any such mitigating evidence. Therefore, assuming *arguendo* that the court erred in failing to submit this circumstance, the error was harmless beyond a reasonable doubt. *See State v. Daughtry*, 340 N.C. 488, 525, 459 S.E.2d 747, 766 (1995), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 739 (1996).

**[21]** Finally, defendant requested the nonstatutory mitigating circumstance that the "defendant does not want to die." However, defendant cites no evidence that was admitted in either phase of the trial in support of this requested circumstance. Therefore, the court properly refused to submit this requested nonstatutory mitigating circumstance. For the foregoing reasons, this assignment of error is overruled.

STATE v. BISHOP

[343 N.C. 518 (1996)]

## XII.

[22] Defendant contends that the trial court erred by allowing the State, in support of the N.C.G.S. § 15A-2000(e)(3) statutory aggravating circumstance that the "defendant had been previously convicted of a felony involving the use or threat of violence to the person," to inform the sentencing jury that defendant had already been sentenced to life imprisonment as an habitual felon. Defendant argues that this constituted plain error because it allowed the jury to speculate that defendant's habitual felon status rested upon other convictions for violent felonies rather than upon the convictions for nonviolent felonies that defendant had actually received. We disagree.

"[T]he preferred method for proving a prior conviction includes the introduction of the judgment itself into evidence." *State v. Maynard*, 311 N.C. 1, 26, 316 S.E.2d 197, 211, *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984). "[T]he most appropriate way to show the 'prior felony' aggravating circumstance would be to offer duly authenticated court records." *State v. Silhan*, 302 N.C. at 272, 275 S.E.2d at 484.

As evidence of the existence of the (e)(3) aggravating circumstance, the prosecutor introduced into evidence a certified copy of a judgment and commitment form showing that defendant had been found guilty by a jury of "Assault with a deadly weapon with intent to kill inflicting serious injury while being a Habitual Felon." The habitual felon language was part of the full name of the offense for which defendant had been convicted. The court did not err in allowing the State to use the judgment and commitment form to prove that defendant had been previously convicted of a felony involving the use or threat of violence to the person.

Furthermore, defendant was not required to leave the jury free to speculate that defendant's habitual felon status rested upon other convictions for violent felonies. A defendant may offer evidence to minimize or rebut the State's evidence of the circumstances of the prior felony. *See State v. Green*, 321 N.C. 594, 611, 365 S.E.2d 587, 597 (where State's witness testified about details of prior violent felony to prove the (e)(3) aggravating circumstance, defendant was able to bring out evidence which gave a "more favorable impression of defendant's character" than would be present had only the armed robbery conviction been introduced), *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988). Defendant was free to offer evidence of the

felonies defendant had committed that gave him the status of habitual felon. This assignment of error is overruled.

## XIII.

[23]    Defendant next contends that six statements made by the prosecutor during his final argument at the sentencing proceeding were improper. Defendant claims that the trial court erred by failing to stop these statements. We disagree. We note at the outset that although wide latitude is allowed the arguments of counsel in both the guilt-innocence and sentencing phases of a trial, "the foci of the arguments in the two phases are significantly different, and rhetoric that might be prejudicially improper in the guilt phase is acceptable in the sentencing phase." *State v. Artis*, 325 N.C. 278, 324, 384 S.E.2d 470, 496 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

First, defendant cites as improper the prosecutor's definition of a mitigating circumstance, arguing that it was incomplete because it ignored the critical importance of evidence concerning defendant's age, character, education, environment, habits, mentality, and prior record. However, the prosecutor's definition was a correct statement of the law, *see id.* at 326, 384 S.E.2d at 497, and was substantially similar to the definition of a mitigating circumstance stated in *State v. Boyd*, 311 N.C. 408, 421, 319 S.E.2d 189, 198 (1984), *cert. denied*, 471 U.S. 1030, 85 L. Ed. 2d 324 (1985), and in the North Carolina pattern jury instructions.

> A mitigating circumstance is a fact or group of facts, which do not constitute a justification or excuse for a killing, or reduce it to a lesser degree of crime than first degree murder, but which may be considered as extenuating or reducing the moral culpability of the killing or making it less deserving of extreme punishment than other first degree murders.

N.C.P.I.—Crim. 150.10 (1995). Although evidence of defendant's age, character, education, environment, habits, mentality, and prior record may be relevant considerations in a sentencing hearing, these words are not essential to the basic definition of a mitigating circumstance. Therefore, this assignment of error has no merit.

[24]    Second, defendant contends the prosecutor improperly argued that the mitigating circumstances should be weighed against "a human life, and the way in which Nan Martin Schiffman died, and the reasons why she died." Defendant argues that this argument was

improper because the capital sentencing scheme requires the jury to balance the mitigating evidence against the aggravating evidence rather than to balance the mitigating evidence against Schiffman's life. However, the prosecutor did not urge the jury to disregard the law, he simply encouraged the jury to focus on the facts he believed justified imposition of the death penalty. "Such encouragement is the job of a prosecutor in a criminal case." *State v. Powell*, 340 N.C. 674, 694, 459 S.E.2d 219, 229 (1995) (prosecutor's argument telling the jurors to focus on the crime instead of the mitigating evidence was not grossly improper), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 688 (1996). Defendant failed to object to this argument, and we do not find that the argument was so prejudicial and grossly improper as to require corrective action by the trial court *ex mero motu*.

[25] Third, defendant contends that the prosecutor improperly advised jurors not to let feelings of mercy or sympathy overwhelm their objectivity. In *State v. Rouse*, 339 N.C. at 93, 451 S.E.2d at 561, we held that statements by the prosecutor that the jury should not base its decision on mercy or sympathy were not grossly improper. In *State v. Artis*, 325 N.C. at 325, 384 S.E.2d at 497, we held that statements by the prosecutor urging the jury to try the case without prejudice and without sympathy, but strictly on the facts of the lawsuit, were not improper.

> In [*California v. Brown*, 479 U.S. 538, 93 L. Ed. 2d 934 (1987)], the United States Supreme Court held that a jury instruction that jurors "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" did not unconstitutionally preclude a fair consideration of the full range of possible mitigation, for its meaning was not necessarily to disregard those impulses altogether, but to do so only where they were divorced from the evidence. *Id.* at 540, 93 L. Ed. 2d at 939.

*State v. Artis*, 325 N.C. at 325-26, 384 S.E.2d at 497. We believe that the prosecutor's statement asking jurors not to let feelings of mercy or sympathy overwhelm their objectivity had similar meaning to the *Brown* jury instruction asking jurors not to be swayed by such feelings. The meaning was not necessarily to ask the jurors to disregard feelings of mercy or sympathy altogether, but to do so only where they were divorced from the evidence, thereby overwhelming the jurors' objectivity. Defendant failed to object to this argument, and we do not find that the argument was so prejudicial and grossly

improper as to require corrective action by the trial court *ex mero motu.*

**[26]** Fourth, defendant contends that the prosecutor's argument improperly urged the jury to impose the death penalty upon defendant as a result of Schiffman's good qualities by attempting to play upon the jury's sympathy for Schiffman and by referring to what Schiffman could have accomplished had she lived. In *Payne v. Tennessee*, 501 U.S. 808, 825, 115 L. Ed. 2d 720, 735-36 (1991), the United States Supreme Court upheld the use of victim-impact statements during closing arguments unless the victim-impact evidence is so unduly prejudicial that it renders the trial fundamentally unfair. The Court stated that victim-impact evidence is simply another method of informing the sentencing authority about the specific harm caused by the crime and held that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. *Id.* In *State v. Gregory*, 340 N.C. 365, 427, 459 S.E.2d 638, 674 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 478 (1996), we held that a closing argument including references to the victims' loss of life and a statement that "[t]hey had a right to a life that went beyond a muddy ditch behind [the college]" did not render the defendant's trial fundamentally unfair. In the case at bar, the prosecutor's arguments about Schiffman and what she could have accomplished served to inform the jury about the specific harm caused by the crime. We conclude that the argument did not render the trial fundamentally unfair.

**[27]** Fifth, defendant contends that the prosecutor's argument that defendant, rather than Kaiser, actually pulled the trigger was improper because it relied on Kaiser's first statement, thereby using for substantive purposes evidence that was admitted to impeach Kaiser's trial testimony. The prosecutor's argument was a direct response to defendant's argument that the prosecutor had given the actual murderer, Kaiser, a life sentence. We have already held in part VII of this opinion that any argument by the prosecutor that defendant pulled the trigger was adequately supported by facts in evidence other than Kaiser's first statement to police. This assignment of error is overruled.

**[28]** Finally, defendant contends that in reading direct quotes from two different reported cases, the prosecutor improperly argued that

defendant should be sentenced to death in order to deter others from committing capital crimes.

> We have long recognized that argument of counsel must be left largely in the discretion of the trial judge and that counsel are entitled to a wide latitude in argument during a hotly contested case. Nevertheless counsel may not by his argument place before the jury incompetent and prejudicial matter not admissible into evidence . . . .

*State v. Cousins*, 289 N.C. 540, 547, 223 S.E.2d 338, 343 (1976) (citations omitted).

We have held that evidence of the general deterrent effect of the death penalty is inadmissible because it is not relevant to defendant, his character, his record, or the circumstances of the charged offense. *E.g., State v. Cherry*, 298 N.C. 86, 97-98, 257 S.E.2d 551, 559 (1979), *cert. denied*, 446 U.S. 941, 64 L. Ed. 2d 796 (1980). Consequently, jury arguments about the general deterrent effect of the death penalty are likewise improper. *See State v. Hill*, 311 N.C. 465, 475, 319 S.E.2d 163, 169-70 (1984) (general deterrence argument improper, but not so offensive as to warrant *ex mero motu* action by the court); *State v. Kirkley*, 308 N.C. 196, 215, 302 S.E.2d 144, 155 (1983) (general deterrence argument improper, but not so egregious as to require corrective action by the trial judge *sua sponte*), *overruled in part on other grounds by State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543 *and by State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988).

Although the prosecutor did not directly argue that the jury should recommend a sentence of death in this case in order to deter others from committing capital crimes, defendant claims that the prosecutor indirectly argued this principle by reading direct quotes from two different reported cases. N.C.G.S. § 7A-97 (formerly N.C.G.S. § 84-14) grants counsel the right to argue the law to the jury, which includes the authority to read and comment on reported cases and statutes that are relevant and refer to authoritative rules of law. *See State v. Gardner*, 316 N.C. 605, 611, 342 S.E.2d 872, 876 (1986).

After reviewing the arguments in the transcript, we conclude that the prosecutor's arguments, in context, could not be construed as urging the jury to recommend the death penalty in this case to deter others from committing capital crimes. Instead, the arguments focused on the appropriateness of capital punishment for "exception-

ally vicious crimes" and "particularly offensive conduct," such as were committed in this case.

Assuming *arguendo* that these arguments could have been interpreted by the jury as indirect general deterrence arguments, on the specific facts of this case, defendant was not prejudiced because defense counsel was allowed to rebut the arguments with a lengthy direct argument on the subject, emphasizing that "[s]cholar after scholar, in doing research on the issue, has proven that the death penalty does not act as a deterrent." This assignment of error is overruled.

## XIV.

[29] Defendant next contends that the trial court committed plain error because its instructions concerning the N.C.G.S. § 15A-2000(e)(6) aggravating circumstance that "[t]he capital felony was committed for pecuniary gain" did not emphasize that the jury must find that defendant killed Schiffman for the purpose of pecuniary gain in order to find that the circumstance existed. "[T]o reach the level of 'plain error' . . . , the error in the trial court's jury instructions must be 'so fundamental [that it] amount[ed] to a miscarriage of justice or . . . probably resulted in the jury reaching a different verdict than it otherwise would have reached.' " *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993) (quoting *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988)). We decline to find plain error.

The trial court instructed the jury on pecuniary gain as follows:

Number four: Was this murder committed for pecuniary gain. A murder is committed for pecuniary gain if the defendant, when he commits this, has obtained money or some other thing which can be valued in money as a result of the death of Ms. Schiffman.

If you find from the evidence beyond a reasonable doubt, that when the defendant killed Ms. Schiffman, or someone acting in concert with him killed her, the defendant took jewelry, silver and credit cards, you would find this aggravating circumstance, and would so indicate by having your foreman write "Yes" in the space provided.

This instruction is substantially similar to the pattern jury instructions. N.C.P.I.—Crim. 150.10. Also, on the issues and recommendation form, the issue regarding the pecuniary gain aggravating circum-

stance was stated: "Was this murder committed for pecuniary gain?" By answering "yes," the jury indicated on the form that the motivation and purpose of the murder was pecuniary gain. *State v. Bacon*, 337 N.C. 66, 100, 446 S.E.2d 542, 560 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995). Assuming *arguendo* that the trial court's instructions did not clearly state that the jury must find that murder was committed for the purpose of pecuniary gain in order to find the circumstance existed, any such error in the trial court's instructions was not so fundamental as to amount to a miscarriage of justice and did not have a probable result of the jury reaching a different verdict than it otherwise would have reached. Therefore, this assignment of error is overruled.

## XV.

**[30]**. Defendant contends that the trial court erred by failing to peremptorily instruct the jury with respect to certain statutory and nonstatutory mitigating circumstances. We disagree.

If requested, a trial court should give a peremptory instruction for any statutory or nonstatutory mitigating circumstance that is supported by uncontroverted and manifestly credible evidence. *State v. McLaughlin*, 341 N.C. 426, 449, 462 S.E.2d 1, 13 (1995), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 879 (1996). If the evidence supporting the circumstance is controverted or is not manifestly credible, the trial court should not give the peremptory instruction. *Id.* The trial court's refusal to give the peremptory instruction does not prevent defendant from presenting, or the jury from considering, any evidence in support of the mitigating circumstance.

The trial court declined to give requested peremptory instructions with respect to two statutory mitigating circumstances: N.C.G.S. § 15A-2000(f)(2), "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance," and N.C.G.S. § 15A-2000(f)(6), "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired."

With respect to these two statutory mitigating circumstances, defendant relies on the testimony of Beth McAllister, a clinical social worker employed as a mitigation specialist by the Appellate Defender's office. McAllister testified that she was asked to put together a social history of defendant for use in his trial. Because McAllister developed the social history to prepare for testifying at

trial, rather than to treat defendant, it lacks the indicia of reliability based on the self-interest inherent in obtaining appropriate medical treatment. *See, e.g., State v. Stafford,* 317 N.C. 568, 346 S.E.2d 463 (1986) (testimony of pediatrician not admissible in guilt-innocence proceeding because based on statements made in preparation of trial rather than for purposes of medical diagnosis or treatment); *State v. Bock,* 288 N.C. 145, 217 S.E.2d 513 (1975) (testimony of psychiatrist not admissible in guilt-innocence proceeding because based on history given by defendant and his family to prepare for testifying at trial rather than to treat and cure defendant), *death sentence vacated,* 428 U.S. 903, 49 L. Ed. 2d 1209 (1976). Although the testimony was admissible in the sentencing proceeding, because it lacks indicia of reliability, we cannot conclude that it is manifestly credible.

Even if McAllister's testimony supported a finding that the two statutory mitigating circumstances existed, this testimony was controverted by evidence presented at both the guilt-innocence and sentencing proceedings. The State presented evidence regarding behavior of defendant that was not consistent with a finding that the two statutory mitigating circumstances existed. The State's evidence tended to show that defendant was able to work at two jobs; that he planned and carried out the crimes of robbery, kidnapping, and murder that are the subjects of this case; and that he took careful steps to conceal these crimes. Because the evidence supporting N.C.G.S. § 15A-2000(f)(2) and (f)(6) was controverted and was not manifestly credible, we do not find the trial court's refusal to give peremptory instructions with respect to these mitigating circumstances to be improper.

The trial court also declined to give requested peremptory instructions with respect to three nonstatutory mitigating circumstances. Two are conditioned on a finding that defendant suffers from mental or emotional disturbances or developmental impairment: "[T]he defendant, due to his mental and emotional disturbances, [is] less able than others to visualize or anticipate social consequences"; and "[T]he defendant's turbulent family history significantly affect[ed] his mental and emotional development." Again, defendant relies on the testimony of Beth McAllister to support these findings. As discussed above, this evidence is controverted and is not manifestly credible. Therefore, we do not find the trial court's refusal to give peremptory instructions with respect to these mitigating circumstances to be improper.

STATE v. BISHOP

[343 N.C. 518 (1996)]

**[31]** The third nonstatutory mitigating circumstance in question stated that "defendant's father physically abuse[d] [defendant] and the other children in the family." To support this mitigating circumstance, defendant relies on the social history developed by Beth McAllister and on the testimony of defendant's mother, Jacqueline Kaiser. As discussed above, McAllister's testimony of abuse lacks the indicia of reliability based on the self-interest inherent in obtaining appropriate medical treatment and is therefore not manifestly credible.

Defendant's mother was unable to describe any specific instances of abuse against defendant or the other children. In fact, she testified that the abuse was not directed toward the youngest child as much because she was still a baby. Defendant presented no medical records or other evidence of specific instances of abuse.

Furthermore, the testimony of defendant's mother may have been influenced by her obvious bias, shown in her understandably emotional response of, "Yes. Oh, yes," when asked if she wanted her son to live. Because of the potential for bias to influence the witnesses' testimony, the trial court instructed the jurors at the end of the sentencing proceeding that in determining whether to believe any witness, they should consider any interest, bias, or prejudice the witness may have.

After reviewing the record, we conclude that the evidence that defendant's father physically abused defendant and the other children in the family was not manifestly credible so as to mandate a peremptory instruction. Therefore, the trial court properly declined to give a peremptory instruction with respect to this mitigating circumstance.

## PROPORTIONALITY REVIEW

## XVI.

**[32]** We now turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. We have examined the record, transcripts, and briefs in the present case and conclude that the record fully supports the four aggravating circumstances found by the jury; that the defendant had been previously convicted of a felony involving the use of violence to the person, N.C.G.S. § 15A-2000(e)(3); that the murder was committed for the purpose of avoiding a lawful arrest, N.C.G.S. § 15A-2000(e)(4); that the murder was committed by the defendant while the defendant was engaged in the commission of kidnapping, N.C.G.S. § 15A-2000(e)(5);

and that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6). We also find that the jury's failure to find certain submitted mitigating circumstances was a rational result from the evidence. Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We must now turn to our final statutory duty of proportionality review.

Proportionality review is designed to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden,* 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In conducting proportionality review, we determine whether "the sentence of death in the present case is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant." *State v. Williams,* 308 N.C. 47, 79, 301 S.E.2d 335, 355 *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 177 (1983); *accord* N.C.G.S. § 15A-2000(d)(2). We do not conclude that the imposition of the death penalty in this case is aberrant or capricious.

In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum,* 334 N.C. 208, 433 S.E.2d 144 (1993), *cert. denied,* —— U.S. ——, 129 L. Ed. 2d 895 (1994). It is also proper for this Court to compare this case with the cases in which we have found the death penalty to be proportionate. *Id.* Although we review all of the cases when engaging in this statutory duty, we will not undertake to discuss or cite all of those cases each time we carry out that duty. *Id.*

This case is distinguishable from each of those cases in which this Court has found the death penalty disproportionate. In three of those cases, *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983), the defendant either pled guilty or was convicted by the jury solely under the theory of felony murder. Here, defendant was convicted on the theory of premeditation and deliberation as well as under the felony murder rule. We have said that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis,* 325 N.C. at 341, 384 S.E.2d at 506.

The jury's finding of the prior conviction of a violent felony aggravating circumstance is also significant. *See id.* at 342, 384 S.E.2d at

507. "[N]one of the cases in which the death sentence was determined by this Court to be disproportionate have included this aggravating circumstance." *State v. Harris*, 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 752 (1995).

The jury's finding of the aggravating circumstance that the murder was committed for the purpose of avoiding a lawful arrest is also significant. The evidence shows that defendant told Kaiser that they were going to have to kill Schiffman because she knew who they were.

[W]e have never found a death sentence to be disproportionate in witness-elimination cases. The reason is clear: "Murder can be motivated by emotions such as greed, jealousy, hate, revenge, or passion. The motive of witness elimination lacks even the excuse of emotion." *State v. Oliver*, 309 N.C. 326, 375, 307 S.E.2d 304, 335 (1983). . . . The purposeful and deliberate killing of witnesses or possible witnesses strikes a blow at the entire public—the body politic—and directly attacks our ability to apply the rule of law and to bear witness against the transgressors of law in our society.

*State v. McCarver*, 341 N.C. at 407, 462 S.E.2d at 49 (citation omitted).

The fact that Schiffman was surprised in her own home by defendant before she was kidnapped and murdered is also significant. As this Court has consistently stated,

[t]he sanctity of the home is a revered tenet of Anglo-American jurisprudence. . . . And the law has consistently acknowledged the expectation of and right to privacy within the home. This crime shocks the conscience, not only because a life was senselessly taken, but because it was taken by the surreptitious invasion of an especially private place, one in which a person has a right to feel secure.

*State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34 (citations omitted), *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

We conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or those in which juries have consistently returned recommendations of life

imprisonment. Therefore, the sentence of death recommended by the jury and ordered by the trial court in the present case is not disproportionate.

## HABITUAL FELON PROCEEDING

## XVII.

**[33]** Defendant also contends that the trial court erred during the habitual felon proceeding (the hearing held to determine whether defendant should be sentenced as an habitual felon in the present case) by admitting evidence showing that defendant previously had been adjudicated to be an habitual felon. We disagree.

Defendant cites *State v. Brown*, 319 N.C. 361, 354 S.E.2d 225 (1987), and *Holton v. Lee*, 173 N.C. 105, 91 S.E. 602 (1917), for the proposition that the judgment or finding of another court is not admissible in a subsequent proceeding as evidence of the fact found at the prior proceeding. However, defendant's reliance on these cases is misplaced. Both *State v. Brown* and *Holton v. Lee* address the protection of a defendant's constitutional right to confrontation. Both cases hold that a fact found in a prior proceeding is not admissible against a defendant who was not a defendant in the prior proceeding and did not have the opportunity to present a full defense at the prior proceeding. In the case at bar, defendant's confrontation rights are not at jeopardy because he was also the defendant in the prior proceeding.

Furthermore, even if the evidence showing that defendant previously had been adjudicated to be an habitual felon was admitted improperly, defendant can show no prejudice. N.C.G.S. § 14-7.1 provides that "[a]ny person who has been convicted of or pled guilty to three felony offenses in any federal court or state court in the United States or combination thereof is declared to be an habitual felon." The State presented evidence of defendant's prior convictions that supports a declaration that defendant is an habitual felon. Defendant does not contend that any of the prior convictions supporting the habitual felon adjudication in the present case do not exist. We conclude that the admission of evidence showing that defendant previously had been adjudicated an habitual felon could not have affected the outcome of defendant's habitual felon proceeding in the case at bar. Therefore, this assignment of error is overruled.

## FORFEITURE PROCEEDING

## XVIII.

[34] Defendant finally contends that the trial court erred by ordering the forfeiture of defendant's Datsun truck and Cadillac automobile because the forfeiture was not authorized by N.C.G.S. § 90-112. Defendant correctly argues that N.C.G.S. § 90-112, which pertains to the forfeiture of vehicles involved in violations of the Controlled Substances Act, is not applicable in this case. However, the forfeiture was authorized by N.C.G.S. § 14-86.1, which, among other things, authorizes the forfeiture of certain vehicles used by any person in the commission of armed robbery. Defendant was found guilty of robbery with a dangerous weapon, which is another name for armed robbery. *See State v. Handy*, 331 N.C. 515, 419 S.E.2d 545 (1992); *State v. Roddey*, 110 N.C. App. 810, 431 S.E.2d 245 (1993). Both vehicles were used in the commission of the armed robbery; defendant drove to Schiffman's house in the Datsun truck, and he effected his escape in the Cadillac after his girlfriend drove it to pick him up. This assignment of error is overruled.

## PRESERVATION ISSUES

## XIX.

Defendant concedes that his remaining assignments of error, enumerated XIX through XLI and set out on pages 195 through 216 in his brief, concern issues that this Court has previously decided contrary to his position. Defendant raises these issues to provide this Court an opportunity to reexamine its prior holdings and to preserve the issues for any future *habeas corpus* review. We have carefully considered defendant's arguments on these issues. We find no compelling reason to depart from our prior holdings, and we are not persuaded that prejudicial error occurred so as to warrant a new trial. However, the issues are preserved for any necessary future review by a federal court.

Having considered and rejected all of defendant's assignments of error, we hold that defendant received a fair trial and sentencing proceeding, free from prejudicial error. Comparing this case to similar cases in which the death penalty was imposed and considering both the crime and defendant, we cannot hold as a matter of law that the death penalty was disproportionate or excessive. Therefore, the

sentence of death entered against defendant must be and is left undisturbed.

NO ERROR.